Appeals from the decree of the Chancellor sitting in two cases on cross bills filed in Kent County, before Gilpin C. J. and Wootten, Houston and Wales, Justices.
The cases came up for a hearing together before the court at this term upon appeals from the decrees of the *Page 131 
Chancellor sitting in the cases in Kent County on cross bills filed by the parties upon a written agreement signed and sealed by them for the purchase of a farm by Shock from Lesley. On the 22d day of August, 1859, by virtue of the agreement executed by them, Shock, who then held a judgment and mortgage against one John Fleming on a certain farm in Sussex County which he had before sold and conveyed to him for $4500.00, payable in nine annual instalments of $500 each, with interest, the first on or before March 1st, 1859, and the others on or before the same day and month in each and every year thereafter, contracted to buy of Lesley a certain farm in Kent County and for it to assign him the judgment and mortgage which he held on the farm in Sussex against Fleming, and to execute and deliver to Lesley the mortgage of himself and wife on the farm in Kent County to be conveyed to him by the latter, for the sum of $1500, payable in three annual instalments of $500 each, with interest, the first on or before March 1st, 1860, and the others on or before the same day and month in each and every year thereafter, and also his judgment bond for the same sum payable in the same manner, to secure to Lesley the first three instalments of $500 each, with interest, payable on the judgment and mortgage of Shock on the farm in Sussex against Fleming, and so to be assigned by Shock to Lesley; and which by the terms of the agreement, were to be the consideration for the farm in Kent County, so to be conveyed by Lesley to Shock. The latter was also to pay the former $200 in cash, on or before March 1st, 1860, which was to be a credit on the first instalment of $500 payable on the latter mortgage for $1500. In consideration of which Lesley was to convey to Shock by a good and sufficient deed of bargain and sale the farm in Kent County, and was also to execute and deliver to him a power of attorney to authorize him to collect the first three instalments of $500 each, with interest when due, on the mortgage first above mentioned to be assigned by him to Lesley on the farm in Sussex against Fleming, and when collected, *Page 132 
after reserving to his sole use and benefit, the amount of interest due thereon up to the date of the agreement between the parties, which was $405, the balance, or the amount of the said first three instalments with interest, was to be paid over by him to Lesley, and upon the receipt of it by him, he was to satisfy the judgment and mortgage of Shock and wife to him for the $1500, and was then to hold the mortgage and judgment against Fleming on the farm in Sussex, at his own risk as to the collection and payment of the residue or balance thereof. On the 3rd of September following the agreement was duly executed and performed in all respects as stipulated in it by the parties to it. The letter or power of attorney executed and delivered under it by Lesley to Shock, authorizing him to collect the first three instalments on the mortgage of the latter against Fleming and assigned to Lesley under the agreement, was as follows: $500 principal and $450 interest, $45 of said interest to be paid to the said Lesley with the aforesaid $500 principal on or before March 1st, 1860 — $500 principal and $60 interest on or before March 1st, 1861, and $500 principal and $30 interest on or before March 1st, 1862, which sums when collected are to be applied to the payment of the instalments and interest on a mortgage of the said Shock and wife to the said Lesley, dated September 2d, 1859, except the sum of $405 interest which the said Shock is authorized to appropriate and apply to his own use, and which interest had accrued thereon previous to the execution of the agreement between the parties.
The bill of complaint filed by Shock in the court below, which was on the agreement, alleged that according to the true meaning and construction of it, and the intention and understanding of the parties when they executed it, the assignment of the mortgage and accompanying judgment for $4500 which he held against Fleming and his farm in Sussex, was to be the consideration moving from him to Lesley for the farm in Kent which the latter was to convey to him, and that that was the specific mode in which it *Page 133 
was to be paid for according to the terms of the agreement between them. That the design and object of his giving to Lesley at the same time his mortgage with the accompanying bond for $1500, on the farm conveyed by Lesley to him, payable in the mode stipulated in it, was merely to secure to Lesley the payment of the first three instalments upon the mortgage against Fleming which he had thus assigned to him in payment for and in consideration of the farm which he had purchased from him. That such was the sole purpose of it, was evident from the power of attorney given under the agreement by Lesley to him to collect the first three instalments with interest on the mortgage against Fleming assigned to him, which expressly so stated, and that when collected and paid over by him to Lesley, reserving out of the sum, the amount of the interest, $405 which had accrued on the mortgage prior to the agreement, the mortgage thus securing those instalments was to be satisfied by the latter, and his only remaining security was to be the mortgage assigned against Fleming for the balance of principal and interest due upon it. That Shock at the same time he executed the mortgage of himself and wife to Lesley, also executed and delivered his judgment bond to him for the same amount and payable in the same manner by instalments on the same days, on which judgment had been entered at the suit of Lesley against him in the Superior Court in and for Kent County at the April Appearances, 1859; and that the transfer and assignment of the mortgage against Fleming for the $4500, payable as before stated, and the execution and delivery of the mortgage for the $1500, with the accompanying judgment for the same amount to secure the first three instalments on the mortgage against Fleming so assigned to him, were so made to Lesley by him with the full belief and expectation that according to the agreement and the true intent and meaning of it, he would be allowed to collect the first three instalments with the interest thereon sufficient to pay the mortgage and obligation so given by him to Lesley, and also the sum of $405 for his *Page 134 
own use and benefit, which was part of the said sum of $4500, and which according to the agreement and the letter of attorney from Lesley he was to have and receive. That upon the delivery of the deed to him by Lesley for the farm which he thus purchased from him, he paid him $200 according to the terms of the agreement and afterward on or about the 1st of March, 1860, had paid him the further sum of $345 which together amounted to the full payment of the first instalment of $500 with the interest on the whole of $1500 due thereon up to the day, month and year last mentioned; and supposing and believing that he had the right under and by virtue of the letter of attorney from Lesley to him, and not being able to collect any of the sums of money due from Fleming, except the sum of $150 which he had voluntarily paid him and which was included in the first payment made by him to Lesley, by other means, he caused to be issued on or about the 21st day of January, 1861, out of the Superior Court in and for Sussex County, a writ of fieri facias at his suit for the use of Lesley against Fleming on the judgment in his favor and by him assigned to Lesley as before stated, for the collection of the first and second instalments with the interest then due and payable thereon, with the intention and for the purpose of applying the proceeds to arise therefrom in payments to Lesley as stipulated and specified in the agreement; but as the sheriff of the county in whose hands it had been placed, could find no personal property of Fleming on which to levy it, he was by his order proceeding to sell his real estate then advertized for sale under a writ of venditioni exponas placed in his hands for that purpose, when he (Shock) was told by Lesley that he would have nothing to do with the sale, and unless the former stopped it, he would; and thereupon finding that he had no legal right to proceed in the matter, he ordered and directed the sheriff to stop further proceedings thereon. And that the real estate of Fleming which was bound by the mortgage thus assigned to Lesley, was and still is more than sufficient to pay the amount of it. *Page 135 
And furthermore that Lesley, although repeatedly and urgently requested by him so to do, had not and would not proceed to collect on the mortgage or judgment against Fleming the balance of the first three instalments with interest, to secure which his bond and mortgage had been given him, although the property of Fleming was amply sufficient to pay the same; and would not permit him to do it pursuant to the agreement and the true intent and meaning of the letter of attorney from Lesley to him, even to the amount of the $405, which was due to him thereon in his own right exclusively. That instead of Lesley's first exhausting his remedy against the real estate of Fleming, and then in case the same was not sufficient to pay the amount which he had bound himself to secure to him, and then calling on him to make good the deficiency, he positively and peremptorily refuses to adopt any legal means or measure whatever to collect the same or any part thereof, or to permit him to do it; but on the contrary had caused to be issued out of the Superior Court in and for Kent County, a writ of fieri facias, No. 172 to October Term, 1861, for the collection from him of the second instalment with interest on the judgment entered in that court in favor of Lesley against him; and which judgment as well as the mortgage for the same sum, were given him merely as an indemnity to secure the payment of the first three instalments with interest on the mortgage and judgment assigned to him against Fleming, and which had been levied by the sheriff of that county upon his personal property, and who was about to proceed to sell the same, when he filed his affidavit in that honorable court, stating all the facts herein set forth, on which he prayed an injunction to restrain Lesley and the sheriff from further proceedings under the writ, which was granted August 20th, 1861, but was afterward dissolved in consequence of the failure of the complainant to file his bill of complaint in time, and he had afterward to pay on the writ the sum of $543.05 to the sheriff and $60 to Lesley in full of the principal, interest and costs on the second instalment of the judgment of Lesley against him. *Page 136 
The prayer was that Lesley might be decreed to specifically perform the agreement and to account for all moneys received from him, whether by voluntary payment or under execution process, and also of all money received from Fleming since the agreement was executed by them, and that the sum so received by him should be applied toward the payment of his mortgage and judgment against him according to the agreement, and that he might be permitted to proceed under the letter of attorney from Lesley to collect and receive from Fleming the sums of money therein specified according to the terms, true intent and meaning of the same and of the agreement, and to reimburse himself the several sums of money paid by him as herein before mentioned, so that the whole of the sum of $1500 with interest secured by him to be paid to Lesley out of the mortgaged premises of Fleming, might be so paid and he saved from paying Lesley any sum of money whatever, unless Fleming should be unable to pay the same and it could not be made out of his land, and then only the difference between what could be made out of his lands and the sum of $1500 with interest thereon; and also that he might be allowed to collect for his own use the sum of $405 from Fleming on the mortgage and judgment assigned to Lesley against him, according to the agreement and the letter of attorney, and that Lesley might be restrained and enjoined from revoking the letter of attorney, and from interfering with or prohibiting him from collecting in his name the sums of money therein mentioned according to the tenor, true intent and meaning thereof; and also restraining and enjoining Lesley, his agents and attorneys, from proceeding to collect by execution process or otherwise under the judgment in the Superior Court in Kent County in favor of Lesley against him, the sum of $500, with interest, the third and last instalment on it; and for other and further relief.
The following bill of complaint filed in the Court of Chancery in Kent County by Lesley against Shock on the same agreement, will sufficiently disclose the nature and *Page 137 
grounds of the defence taken by him to the preceding bill, to dispense with the necessity of reporting his answer to it, or of referring more particularly to it in the present connection of the two cases. It was upon the same contract which it stated substantially in the same terms in all respects, but proceeded upon a different view of the true meaning and construction of it, for an injunction to restrain and prohibit Shock from issuing, or proceeding upon any process at law in any manner whatever against Fleming, or against the lands and tenements of Fleming under the judgment, or mortgage against him assigned by Shock to Lesley.
It accordingly alleged that the true and real consideration of the conveyance of the farm in Kent County by Lesley to Shock, was the sum of four thousand five hundred dollars and that was in truth and in fact, the actual price agreed to be paid and accepted for it by the respective parties to the contract; and that in payment thereof Shock proposed and offered to assign to Lesley the said judgment and mortgage against Fleming for $4500 on the farm of the latter in Sussex County, but that Lesley believing the said farm of the latter was not of sufficient value to pay that amount of the mortgage debt, refused to accept the assignment of the said judgment and mortgage in payment of said consideration money, unless the same was further secured to him; upon which Shock consented and agreed to secure to him a part of the said $4500.00, to wit, the sum of $1500 with interest by bond and mortgage on the farm about to be conveyed to him by Lesley; and that in accordance with such understanding, the mortgage of Shock and wife with his accompanying judgment bond was executed and delivered to Lesley for that amount, payable in three annual instalments of $500 each, with interest on March 1st, 1860, March 1st, 1861 and March 1st, 1862, at the same times when the first three annual instalments of the same amount each with interest, were payable under the judgment and mortgage against Fleming for $4500, which were assigned to him and which *Page 138 
was to that extent secured by it. And that the true intent and meaning of the said letter of attorney from Lesley to Shock and the said articles of agreement was, that the said Shock should have authority to make a personal demand upon the said Fleming for the said several sums of money mentioned in said letter of attorney, and that when the said Fleming should voluntarily pay the same to him, he the said Fleming should be credited with them on the said mortgage assigned to Lesley. But that neither the said bond nor the said judgment thereon against Fleming assigned to Lesley, was even so much as mentioned or named in the said letter of attorney to Shock from Lesley, and that the said mortgage against Fleming was alone named and mentioned therein, and that was only for the purposes above stated; and he therefore insisted that he did not authorize by said letter of attorney, and never had in any other manner, authorized or empowered Shock to assume the management, or control of either the said judgment, or mortgage against Fleming, or to issue any writ or process thereon whatever against him; but on the contrary thereof, he insisted that he was the only true and legal owner and holder of the said judgment and mortgage against the said Fleming, and that the said Shock had no right without his consent and against his will to issue any process whatever thereon, nor was he entitled to any part of the proceeds of a sale of the mortgaged premises of Fleming, until he (Lesley) had been first paid the full sum of $4500, with interest thereon from the 22nd day of August 1859, the date of the said agreement.
The bill further stated that Shock, well knowing that he had no right or authority so to do, had on or about the 22nd day of January 1861, without the consent or knowledge of Lesley, caused a writ of fieri facias to be issued out of the Superior Court for Sussex County on the judgment against Fleming, and to be levied on the mortgaged premises belonging to him, and afterward a writ ofvenditioni exponas for the sale of them, of which he (Lesley) was wholly ignorant until a few days before the time fixed for *Page 139 
the sale, when he at once forbade it and further proceedings thereon were stopped by Shock. And that pursuant to a bill of complaint filed in that court in the month of March last by Shock against him, he caused a writ of injunction to be issued out of it, whereby he was restrained among other things from revoking the said letter of attorney from him to Shock, or in any wise interfering with or preventing him from proceeding on the judgment and mortgage against Fleming, but to which bill of complaint and the several matters complained of in it, he had made full and true answer under oath, as would appear by the same therein filed in the month of April last, and thereupon the injunction was dissolved. Nevertheless that Shock, well knowing, as he had admitted in that bill, that he had no legal right to proceed on the said judgment and mortgage against Fleming, but intending to deceive and defraud him (Lesley) as he verily believed, after the issuing of the said injunction against him, had on or about the 22nd day of March last, caused to be issued out of the Superior Court for Sussex County an alias venditioni exponas upon the said judgment against Fleming, returnable to April Term, 1862, to sell the said mortgaged premises of Fleming, and the day fixed for the sale of the same thereon was the 12th day of April, 1862. That he was wholly ignorant that any such writ had been, or was intended to be issued, until a few days before the time fixed for the sale thereon. That a sale on said judgment would destroy the lien of the mortgage assigned to him against Fleming upon the lands sold under it, except as to the contingent interest and inchoate right of dower of the wife of Fleming therein, and that the proceeds thereof would be applicable not only to judgments recovered against Fleming prior to, but also subsequent to the recording of the said mortgage against him, and therefore he believed for the manifest reason stated, that the premises would sell for much less money under the judgment than under the mortgage, and that the proceeds of such a sale, would not be sufficient to pay the balance due him on the said judgment and mortgage. *Page 140 
And that Shock had also sued out of the Superior Court for Sussex County, a writ of scire facias returnable to April Term, 1862, on the said mortgage against Fleming and wife, to obtain a judgment of condemnation and sale of the premises thereon. That Fleming had paid him no part of the principal or interest of the said mortgage so assigned to him, except the sum of $96 about the 1st of March, 1860, which he had allowed at the last April Term of that Court, as a credit on the bond and mortgage of Shock to him, and that the latter had paid him the balance of the principal and interest of his mortgage, and the balance of the third and last instalment of it since the issuing of the injunction in the present case, and that he then held the judgment and mortgage against Fleming without the right of recourse to Shock, and that he was entitled to recover thereon for his own use the sum of three thousand dollars, that being the amount of the remaining six annual instalments payable upon them, with interest thereon from the date of the agreement, and that Shock would be entitled to receive out of the balance of the proceeds of a sale of the premises under that judgment and mortgage, if any, the interest on the sum of $4500, up to the date of the agreement, to wit, the sum of $405, and also the amount paid by the latter to him on the judgment and mortgage of the latter to him, after first deducting any and all sums of money that might have been paid to the latter by Fleming on account of the judgment and mortgage against him. The bill charged that it was the design and intention of Shock, if suffered so to do, to effect a sale of the lands of Fleming under the judgment and mortgage against him, and to apply and appropriate the whole of the proceeds thereof to himself; whereas it was the true intent and meaning of the agreement and the letter of attorney before referred to, that Shock should have no right or authority to sue out any writ or process whatever on the judgment or the mortgage against him, and that he was in no event to be entitled to any portion of the proceeds *Page 141 
of a. sale under that judgment or mortgage, until he (Lesley) should be paid in full the balance due him on the same, to wit, $3000, with interest thereon from the 22nd day of August, 1859, the date of the agreement. Wherefore it prayed as is herein before stated.
The answer to the bill admitted all the facts stated in it, but controverted the construction given to the agreement by it, and the conclusions deduced from it, in conformity with the view presented in regard to the meaning and effect of it in the bill filed by Shock as is herein before first stated. Both cases were heard in the court below on bill and answer and exhibits filed, without depositions.
In the first case, that of Shock against Lesley in the court below, the Chancellor decreed in favor of the complainant on the grounds that it appeared to him after recapitulating and considering all the facts and circumstances in the case and the said agreement between the parties and the letter or power of attorney from Lesley to Shock, that the latter as the assignor of the said mortgage and judgment against Fleming to Lesley, stood as a security to Lesley for the collection of the said judgment, as the instalments thereof should severally fall due, and that the fair, just and equitable construction of said agreement of the 22nd of August, 1859, and of the letter or power of attorney of the 25th of August, 1859, and that the true intent and meaning of the said agreement and said letter or power of attorney and of said Lesley and. said Shock was, that said Shock should have the power and authority under the said letter or power of attorney to collect the instalments due and as they should fall due under said judgment against said Fleming in said Superior Court in Sussex County, to enable him, the said Shock, to meet and pay the said instalments due and to fall due to said Lesley from said Shock, under said Shock's judgment to said Lesley; and that said Lesley had collected the whole amount of his said judgment of fifteen hundred dollars, as the real debt, with the interests and *Page 142 
costs thereon; he did therefore think fit to order, adjudge and decree, and did therefore order, adjudge and decree that the injunction which had before been ordered and issued in the cause and which had afterward been dissolved, should be thereby revived and continued, and that the said Lesley should be thereby restrained from revoking the said letter or power of attorney and from interfering with, or preventing, or prohibiting the said Shock in collecting in the name and stead of said Lesley, the said sums of money in said letter or power of attorney mentioned from the said Fleming, which were due or would become due on the said mortgage in the said letter or warrant of attorney mentioned, according to the tenor, true intent and meaning thereof; and reserving the power to make such other order or decree in the premises as should be equitable and necessary in the cause, ordered Lesley to pay the costs c.
The decree in the other case, that is to say, of Lesley v. Shock in the Court below was in favor of Shock, and the bill of Lesley, the complainant, was dismissed.
Spruance for the appellant. The Chancellor, though he said it with great deference, manifestly erred in the view which he had taken, as to the construction of the agreement, the purpose and object of the letter or power of attorney from Lesley to Shock, and the true intent and meaning of both of the parties to them at the time of their execution. They were both in general terms, nor was there a word to be found in either of them, which warranted the idea that in the authority delegated to collect simply, the power to sue out legal process and to resort to the last extremity of the law to enforce payment, was included or could have even been contemplated by either of the parties at the time they were drawn and executed, and was conferred by Lesley upon Shock, as the Chancellor had inferred and assumed in this case; for in neither of them was any such power even intimated or implied. The well settled rule of law on that subject was that a power of attorney, *Page 143 
like every other delegated power, was to be construed strictly, and powers not clearly, or expressly granted, nor absolutely necessary for the purpose in view, were never implied, and in all questionable, doubtful, or uncertain cases, the presumption of law was against the authority claimed and in dispute. Where, therefore, the exercise of a specific power was claimed, it must be shown to have been specifically delegated to be exercised in the mode assumed or claimed. And this principle had been repeatedly recognized and ruled in the courts of this State.
But independent of the rule of law which required such a construction to be given to it, there could be no doubt, as a matter of fact and necessary inference, that neither Lesley nor Shock understood, or intended that the latter should have any authority, or power under the letter of attorney, to sue out execution on the judgment against Fleming and sell the lands bound by the mortgage assigned to Lesley in order to enforce in that way, the payment of the money which he was simply to collect under it, when we considered the fact alleged and sworn to in the bill of Lesley, that he was not willing to take the mortgage so assigned to him, as absolutely good for the $4500, the price he was to be paid for his farm by Shock, having grave doubts, to say the least of it, at the time in his mind, as to the value of the farm in Sussex which was bound by it, and its entire sufficiency to pay that sum, and that it was manifestly for that reason alone, that he required the additional security from Shock to make it good for that amount, the actual stipulated price well understood and agreed upon between them, that he was to be paid for the farm which he was about to sell and convey to him under that agreement beyond all doubt or question on that point in his own mind. But with additional security to the amount of $1500, he would be satisfied and would deem himself entirely safe, and would be perfectly willing to deed and convey it in fee to Shock, even on the long credit and slow payments agreed upon in the bargain. Well, such having been his own conviction and apprehension on *Page 144 
that point, and such being the mutual understanding and design of the parties in regard to the matter, was it not proper and prudent in him, in view of the protracted period through which he would have to wait for the ultimate and final payment of the price agreed upon for it, in as much as there was to be by virtue of that arrangement, no acceleration whatever in the annual payments, or instalments, to have it stipulated and agreed upon between them, as the additional security was to be a partial one and only for a portion of it, and to that extent when paid in lieu of the original security to be but a substitution of it, that it should be for the first fifteen hundred dollars with interest which was to fall due on the mortgage to be assigned to him against Fleming, the primary and original security for the whole price, but which after that sum was paid, was to be his only security for the balance of it? As a prudent and judicious man about to enter into such a contract for the sale of his farm on such a long time and such small payments annually, it would, of course be his interest and his object to secure in such an arrangement, the payments first falling due, because, whilst it would render such payments more certain, it would increase the safety and sufficiency of the original and general security for the balance of it. And it was therefore in accordance with this design and this policy, and with this understanding between the parties at the time, that the bond and mortgage of Shock was executed and delivered to Lesley for the fifteen hundred dollars on the farm conveyed to the former by the latter, and were made payable in three annual instalments of five hundred dollars each with interest, on the same days on which the first three instalments for the same amounts on the bond and mortgage of Fleming assigned to him, were to become due and payable. And as it was quite as much for the interest and advantage and future safety and security of Shock in the purchase of the farm which he was about to make with this incumbrance of his own mortgage upon it, to secure to Lesley fifteen hundred dollars of the purchase money he was to pay him for it, *Page 145 
to have those first three instalments promptly and punctually paid, as they fell due on the bond and mortgage against Fleming assigned to Lesley to secure the payment of the whole purchase money, it must have been at his own instance and request that the letter of attorney was made to him, to receive any portions of those sums whenever Fleming was prepared to pay them, and when so collected by him, to be paid to Lesley as a credit on those instalments; and who evidently intended, and who was as evidently expected by Lesley by reason of it, to give his own personal attentions in that way, but in that way only, to the collection of them. But to force the mortgaged premises of Fleming to a public sale on execution process under the judgment against him, subject to a mortgage for the large amount still due upon it, and with so many years to run before its maturity, would have been inevitably attended with such a ruinous sacrifice of it, and would have so endangered the sufficiency of it in that aspect to pay even the balance of the purchase money solely secured by it, that no man with ordinary intelligence and judgment, much less such gentlemen as were, the parties to the agreement in question, could possibly have contemplated it at the time when the contract and arrangement were thus entered into and agreed upon between them.
The principles and rules in regard to the construction of contracts, were the same in equity and in law, and they were always to have such a construction as would best effect the intention of the parties, and where the contract was doubtful, or susceptible of different constructions, one of which would render it absurd or ineffectual, or would defeat the evident design of one of the parties to it, it was never to be so interpreted, but was to have a reasonable construction, so as to accomplish rather than defeat the intention of the parties.Chit. on Contr. 73, 80. Add. on Contr. 845. Lands bound by a prior judgment or recognizance and sold on a junior judgment, are discharged by it. Redding v. State 1 Harr. 190. *Page 146 Vickary v. Vickary 1 Harr. 193. Bank v. Wallace, 3Harr. 370. And it discharges judgments whether due, or not due. To sell the lands bound by the judgment of Shock against Fleming upon the first three instalments due upon it, would therefore discharge them from the lien of all the remaining instalments, although not then due upon it. A mortgage in this State was merely a security for the payment of money, and the mortgagee took practically under it no title to the premises. Robinson v. Harris, 3Harr. 383. Deakyne v. Davis, 3 Harr. 354. And such being the case, if the lands in question should be sold for the first three instalments on that judgment, if would have the effect to discharge them entirely from the lien of the mortgage for the same debt, because such a sale on the judgment, being for the same debt as the mortgage, it would sell and dispose of all the title and interest of Fleming in the lands and leave nothing therein for the lien and security of the mortgage itself to rest upon. Except that a sale on such judgment would not discharge the lands from the contingent and inchoate lien of Fleming's wife's right of dower therein, and to that extent only the lien of the mortgage would attach to and follow it. 2Hil. on Mortg. 37.9 Serg. Rawle, 302.7 Watts
475.6 Whart. 210.
Layton, for respondent. It was not the agreement that Lesley should sell to Shock his farm in Kent County for forty-five hundred dollars, but the agreement between them as proved in writing under their hands and seals, simply was that Shock was to assign to Lesley a judgment and mortgage which he then had and held for a debt of forty-five hundred dollars against one John Fleming on a certain farm in Sussex County, and in consideration of that promise and agreement on Shock's part, Lesley agreed on his part to sell and convey to him, a certain farm which he owned in Kent County. In addition, however, to the consideration stipulated to be given by Shock, as just stated, he further agreed to execute and deliver to Lesley his own bond and mortgage on the farm thus agreed to be *Page 147 
conveyed to him by the latter, for the sum of fifteen hundred dollars payable in three annual instalments of five hundred dollars each at the time therein stipulated with interest, to secure to Lesley the first three annual instalments for the same amounts and payable with interest at the same times on the judgment and mortgage to be assigned to him against Fleming; whilst on the part of Lesley it was also additionally agreed that he would execute and deliver a letter or power of attorney to Shock authorizing and empowering him to collect the first three instalments with interest on the judgment and mortgage to be so assigned to him against Fleming, and when collected and paid to Lesley by him, that he would release to him his bond and mortgage for the fifteen hundred dollars so to be executed and delivered by Shock to Lesley, and would look to the judgment and mortgage so to be assigned to him against Fleming, for the balance of the forty-five hundred dollars with interest payable thereon, without recourse to Shock for any portion of it. Such was the plain, simple, written and sealed contract between the parties.
He would now come to the consideration of the principles of law applicable to the interpretation and construction of that agreement. Every covenant must receive the same construction from every court; for whatever was its true meaning, must be its meaning every where.Platt on Cov. 3 Law Libr. 61, Iggulden v. May, 9Ves. 325.7 East 241. Butcher v. Butcher, 9Ves. 382. Hotham v. East India Co. 1 Doug. 272.Chit. on Contr. 43. Covenants shall be so expounded as to carry into elect the intentions of the parties. Platt on Cov. 3 LawLibr. 61. Chit. on Contr. 75. Ambiguous words, or words inequilibrio are to be taken most strongly against the covenantor, the maxim being verba chartarum fortis accipiuntur contraproferentem. Platt on Cov. 3 Law Libr. 63. Plowd. 287.Buberry v. Jervise, 1 T. R. 234. Fowle v. Welsh, 1Barn. Cress. 637, 2 Dowl. Ry. 133. Love v.Parvis, 13 East 85. Earl of Shrewsbury v. Gould, 2Barn. Ad. 494. Chit. on Contr. 95. Expositions of a deed shall be made to support rather than annul the *Page 148 
transaction. Platt on Cov. 3 Law Libr. 65. Shep.Touchs 166.3 Atk. 136. Chit. on Contr. 83. Upon the principles thus stated by the authorities which he had just cited, he would ask what was the meaning of the covenant, or words contained in the contract, that Lesley should give Shock a letter or power of attorney authorizing and empowering him to collect the three first instalments of five hundred dollars each secured to be paid by the mortgage of Shock against Fleming to be assigned by him to Lesley? What was the meaning, or what could have been the object of such a covenant, or what the use of such a power of attorney, if it was not intended to confer upon Shock the right and power to collect the instalments referred to by process of law, or in other words, to sue out executions on the judgment assigned by him with the mortgage for the same debt to Lesley as the instalments should fall due, and to sue them out in his own name for the use and benefit of Lesley, pursuant to the transfer and assignment of the judgment and mortgage, as he well might do? And such he should unhesitatingly insist was the true meaning of that covenant. For the power to collect, especially when conferred in that form, necessarily imported by due process of law, if necessary; and therefore it could not be construed to mean simply, that he should have authority merely to apply for and receive such pittances as it might suit the convenience, or pleasure of Fleming at any time voluntarily to pay to him, to be applied in the mode indicated in the letter of attorney in payments in which he was as much interested as Lesley himself was. Do grave business men in grave business transactions of as much importance as this was, clothe their agents with formally executed powers of attorney to collect moneys due them on any such free and easy terms as had been contended for on the other side in the present case, or was it usual for any class of persons to do so, when the money is only to be asked for, and nothing more is intended to be done?
But he would go further and with equal confidence contend that having thus assigned the judgment and mortgage *Page 149 
against Fleming to Lesley and taken the letter or power of attorney from him and paid the whole amount of his own bond and mortgage to him which was but an additional security pro tanto for Fleming's judgment and mortgage assigned to him, and of course, for a debt due to him, and which Fleming himself ought to have paid, that in a court of equity Shock stood in the nature of a security for Fleming and now had a right to every remedy against him for the amount so paid, that Lesley could have had. For it was a general and well settled principle of equity jurispendence, that a surety was entitled to every remedy which the creditor had against the principal debtor, to enforce every security and all means of payment, to stand in the place of the creditor, not only through the medium of the contract, but even by means of securities entered into without his knowledge, and to have them transferred to him, though there was no stipulation for it, and to avail himself of them against the debtor. 1 Mad. Ch. 235.1Story's Eq. sec. 493. Theo. on Prin. Sur. 1 LawLibr. 152. Cragthorne v. Swinburn, 14 Ves. 162, 11Ves. 12.2 Vern. Ch. Rep. 608, 15 Ves. 596, 1Johns. Ch. Rep. 596.2 Johns. Ch. Rep. 554.4 Johns.Ch. Rep. 123. As Shock has been clothed by Lesley with a power of attorney to collect the three first instalments on the judgment against Fleming under the contract, and had since paid them himself to Lesley, there could be no doubt a court of equity would on the principle of the authorities last cited by him, now refuse to allow Lesley to revoke it, and would restrain him from doing so, or from interfering with, or attempting in any manner to prevent Shock from reimbursing himself the amount he had thus paid, out of the judgment against Fleming by any and every process necessary for the collection of it in that manner. Besides, the interference of a court of equity in a case like the present, may be justified on the ground of compelling the specific execution of the agreement. 1 Smith's Lead.Ca. 145. Stuyvesant v. Mayor of N. York, 11 Paige
414.5 Ves. 555. *Page 150 
 Comegys for appellant. The error in this case in the court below consisted in the misapprehension of the true nature of a mortgage in this State. A mortgage here was simply a security for the payment of money secured by a conveyance of land. It was simply a pledge of land for the payment of money, and in this State the mortgagor always continues in possession of the mortgaged premises, and his widow on his death is entitled to be endowed out of them and to hold them subject only to the lien of the mortgage, and to be divested of it by a sale of the premises on the mortgage. And when a bond and mortgage are taken for a debt, and judgment is obtained on the bond and the land is sold on the judgment, the lien of the mortgage on the land is discharged by the sale of the land for the debt for which both it and the bond were given. Now in the case before the court, if the land mortgaged by Fleming to Shock had been sold on the judgment entered upon the bond given by him at the same time with the mortgage for the three first instalments of five hundred dollars each secured to be paid by them, what would have been sold by it? Why, we say the land, the whole of it, and that would have discharged the land from the lien of the mortgage in toto. And therefore we say that to have allowed Shock to do what it was claimed for him on the other side he had a right to do, would have had the effect to destroy absolutely by means of the additional security which he had taken from Shock for but little more than one-third of the debt, the original security which he had taken of the same nature for the whole of it, and that would have been such an astonishing absurdity that it was impossible for any one to suppose that such was the meaning of the agreement, or the understanding and intention of either of the parties to it, and especially of Lesley, at the time it was entered into and executed by them.
He would in conclusion glance for a moment at the prayer of Shock's bill of complaint, which was for general and for specific relief, the latter that he may be allowed to proceed to collect the instalments referred to, under his *Page 151 
power of attorney in the mode already attempted by him. But his prayer for general relief the court would find was altogether inconsistent with it. The doctrine of subrogation or substitution applied only in the case of principal and surety, and when the surety had paid the whole debt for his principal. It only applied when the legal relation of principal and surety existed between the parties. But in the case before the court, Shock was no surety for Fleming in his mortgage, or in his bond accompanying it, and no such relation as that of principal and surety subsisted between them in the matter as to Lesley, and therefore the principle of subrogation, or substitution in regard to that relation, as understood and recognized in courts of equity, could have no application to the present case.
Wootten, Justice, announced the opinion of the court. We are all of one opinion in this case that the Chancellor erred in the construction which he gave to the agreement in writing of the 22nd of August, 1859 between the parties, Lesley and Shock, and in the effect which he gave to the power of attorney from the former to the latter executed in pursuance of it three days afterward, on the 25th of August, 1859. We consider that the true intent and meaning of that agreement, as well as the design and object of the parties at the time it was entered into and concluded between them, was simply to strengthen, fortify and make sufficient the security of the judgment and mortgage against Fleming for the forty-five hundred dollars and interest, which Shock agreed to assign to Lesley in satisfaction and payment for the land in Kent County which Lesley had agreed to sell Shock at that price, but which the former was not willing to accept alone, as a sufficient security for that sum, with the belief entertained by him that the lands in Sussex sold by Shock to Fleming and bound by that mortgage and judgment, were not worth at that time exceeding the sum of three thousand dollars, by taking additional security in the form of a bond and mortgage from Shock to Lesley on the lands in Kent County to be *Page 152 
conveyed by Lesley to Shock, for the first three instalments of the Fleming mortgage of five hundred dollars each, with interest, amounting to fifteen hundred dollars, which was just the difference between the value of the premises bound by it, as admitted by Lesley, and the whole amount of the mortgage, which was forty-five hundred dollars, at which latter sum it was quite apparent and certain that they both then estimated the value of the lands which Lesley by the agreement was to convey to Shock. That, we think, it is evident, was the price it was agreed by Shock should be secured to Lesley for his land, and that was the price which the latter agreed to take and expected to receive for it, the payment of it to be satisfactorily secured to him in the mode alluded to, that is to say, by the assignment of the mortgage and judgment which Shock held against Fleming for forty-five hundred dollars, to be paid in nine annual instalments of five hundred dollars each with interest, and by the bond and mortgage of Shock and wife upon the premises to be sold and conveyed to him by Lesley, to secure the payment of the first three instalments of that mortgage so to be assigned by him to Lesley, of five hundred dollars each with interest, as the same should become payable pursuant to the terms of it. And with this view and intention, and for the convenience and accommodation of Shock, who thus assumed the obligation to pay, and made the land he bought of Lesley liable to pay, these three instalments of the mortgage and judgment against Fleming and assigned by him to Lesley, we consider and have no doubt that the power of attorney in question, was given to him by Lesley merely to enable him with his authority and consent to call upon, collect and receive the money upon them from Fleming whenever it might suit his convenience to make any payments upon them, and when so collected and received, to pay it over to Lesley to be credited on the mortgage upon which it had thus been paid. The design and understanding of both of the parties to the agreement and the power of attorney executed and delivered under it, must have been, we are *Page 153 
satisfied, that under the power Shock should have authority by personal and proper applications to Fleming to collect and receive moneys from him on the mortgage and judgment against him, in the name of Lesley and to duly receipt to him for the same, whenever he might be prepared to pay, or Shock might deem the occasion suitable or the prospect reasonable for collecting any from him by such applications; but not that he should have any power or authority under it, to sue out execution process upon either the judgment or mortgage to enforce the payment of either of them, or any part of them, without the consent, or against the will of Lesley to whom they had been formally and legally assigned on the record; for there is nothing in the agreement, or the power of attorney according to the view which we take of them, to warrant such a construction of them, as we are well convinced that it could not have been the design of Lesley, or the understanding of Shock, that the power conferred by the letter of attorney, should in any event be exercised in such a way as in any manner to endanger, impair or prejudice the value or sufficiency of either the original or additional security for the price of the land about to be sold by the former to the latter, or to defeat the arrangement and purpose of the agreement itself, which might and probably would be the case, if the lands of Fleming bound by the mortgage and judgment, were to be subjected to a public sale on execution process for the portions of the debt now due and payable upon them. We will only add in conclusion, one suggestion that serves to strengthen in some degree the view we have taken of the meaning of the contract, the understanding of the parties and the purpose and object of the power of attorney in question, that there could hardly have been any occasion in this instance, for Lesley to appoint an attorney in fact to collect by execution process, a debt due him on a judgment in any of our courts, as that could have been as well and perhaps, better attended to by his attorney at law on the record marked to the case, and that it is the usual practice for the attorneys and *Page 154 
officers of our courts, and not of attorneys in fact, to attend to the collection of judgments by execution process, when it becomes necessary to resort to that method of doing it.
The decrees of the Chancellor in both of these causes must, therefore be reversed.
And accordingly a decree was entered in this court in the first case of Lesley against Shock in the court below, perpetually restraining and enjoining Shock from issuing any writ or process upon the judgment or mortgage against Fleming assigned to Lesley, or taking any proceedings upon them to collect any part of the debt secured by said judgment and mortgage by the sale of the said lands and tenements embraced in the said mortgage. And a decree in the other case of Shock against Lesley in the court below, that the injunction ordered and issued by the Chancellor and by him dissolved and afterward by him revived and continued in that cause, should be thereby dissolved and annulled.